UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GLENN R. VERDAGUER,

                              Plaintiff,

           - against -

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,[1]

                              Defendant.

12 Civ. 6858 (VB)(PED)

<u>REPORT AND
RECOMMENDATION</u>

TO:    THE HONORABLE VINCENT L. BRICCETTI,
       UNITED STATES DISTRICT JUDGE

## I.  INTRODUCTION

Plaintiff Glenn VerDaguer, proceeding *pro se*, brings this action pursuant to 42 U.S.C. §

405(g) challenging the decision of the Commissioner of Social Security (the "Commissioner")

denying his application for benefits on the ground that he is not disabled within the meaning of

the Social Security Act (the "Act"), 42 U.S.C. §§ 423 *et seq.*

Presently before this Court, pursuant to an order of reference, Dkt. No. 6, is the

Commissioner's motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal

Rules of Civil Procedure.  Dkt. Nos. 21 (Defendant's Notice of Mot.), 22 (Defendant's

Memorandum of Law ("Def.'s Mem.")).  Because Plaintiff's Reply Affirmation in Opposition to

Defendant's Motion, Dkt. No. 24 ("Pl.'s Mem."), affirmatively urges this Court to vacate and

reverse the Commissioner's decision, Plaintiff's filing will be treated as a motion for judgment on

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Acting Commissioner
Colvin is substituted for her predecessor, Michael J. Astrue.

the pleadings pursuant to Fed.R.Civ.P. 12(c).[2]  For the reasons set forth below, I respectfully recommend that Plaintiff's Motion for Judgment on the Pleadings be **GRANTED**, that Defendant's Motion for Judgment on the Pleadings be **DENIED**, and this case be remanded pursuant to 42 U.S.C. § 405(g), sentence four, for further administrative proceedings.

## II. <u>BACKGROUND</u>

A.    <u>Plaintiff's Application</u>

Plaintiff was born on January 11, 1965 and was forty-three years old when he applied for Supplemental Security Income ("SSI") benefits on October 22, 2008.  R 128–31.[3]  In his application, Plaintiff claimed that he had been unable to work since August 12, 2008 because of left eye blindness, the result of being stabbed with a broken champagne flute at a wedding in the Dominican Republic.  R. 142, 248.  Plaintiff's application stated that he was unable to work for the following reason:  "I cannot see what I need to do."  R. 142.  Plaintiff's application also indicated that he had completed a GED and had a varied work history, including a job as a gas station manager in 2001–2002.  R. 149–66.

B.    <u>Medical Evidence</u>

On August 22, 2008, Plaintiff visited New York Eye and Ear Infirmary and was assessed with a ruptured globe in his left eye and lacerations on his lower eyelid and forehead.  R. 441. Drs. Lawrence Jacobson and Debra Kroll performed the following surgical procedure on

---

[2] "Although a remand request is normally made by a party, there is no reason why a court may not order the remand *sua sponte*."  <u>Clark v.. Callahan</u>, No. 96 Civ. 3020 (SAS), 1998 WL 512956, at *1 (S.D.N.Y. Aug.17, 1998) (internal quotation marks omitted).

Copies of unreported cases will be mailed to the *pro se* plaintiff.  <u>See</u> <u>Lebron v. Sanders</u>, 557 F.3d 76 (2d Cir. 2009).

[3] Citations to "R. __" refer to the administrative record that was filed with the Commissioner's answer.  Dkt. No. 14.

Plaintiff: "repair of ruptured globe, left eye; removal of intraocular and intraorbital foreign bodies; repair of full-thickness lid laceration; repair of forehead laceration; lateral tarsal strip." R. 441.  Plaintiff was prescribed Levaquin (levofloxacin),[4] Pred Forte (prednisolone acetate),[5] Vigamox (moxifloxacin),[6] acetaminophen with codeine (Tylenol with codeine),[7] Tylenol (acetaminophen) and Reglan (metoclopramide hydrochloride).[8]  R. 435.

On September 8, 2008, plaintiff again underwent surgery at New York Eye and Ear Infirmary.  R. 198.  Dr. Afonso Ponce, the surgeon, described the operative procedure as a "secondary ruptured globe repair with pars plana vitrecotmy, scleral buckle, membrane peeling, retinectomy, perfluorocarbon injection, endolaser, air fluid exchange, silicone oil injection, and iris complications: none."  R. 198.  In addition to his previously prescribed medications, Plaintiff

---

[4] "Levofloxacin is used to treat certain infections such as pneumonia, chronic bronchitis and sinus, urinary tract, kidney, prostate (a male reproductive gland), and skin infections." Levofloxacin: MedinePlus Drug Information, http://www.nlm.nih.gov/medlineplus/druginfo /meds/a697040.html (last visited Oct. 22, 2013).

[5] Prednisolone is an anti-inflammatory drug.  See Prednisolone – National Library of Medicine – PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0001486/ (last visited Oct. 22, 2013).

[6] "Moxifloxacin ophthalmic solution is used to treat bacterial conjunctivitis (pink eye; infection of the membrane that covers the outside of the eyeballs and the inside of the eyelids)." Moxifloxacin Ophthalmic Solution: MedinePlus Drug Information http://www.nlm.nih.gov/medlineplus/druginfo/meds/a605016.html (last visited Oct. 22, 2013).

[7] Acetaminophen and codeine "is used to relieve mild to moderate pain." Acetaminophen and Codeine: MedinePlus Drug Information, http://www.nlm.nih.gov/medlineplus/ druginfo/meds/a601005.html (last visited Oct. 22, 2013).

[8] Metoclopramide is "sometimes used to treat the symptoms of slowed stomach emptying in people who are recovering from certain types of surgery."  Metoclopramide: MedinePlus Drug Information, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a684035.html (last visited Oct. 22, 2013).

was prescribed Percocet (oxycodone and acetaminophen).[9]  R. 254.  Plaintiff's treatment records

show intermittent follow-up visits over the next several months.  See R. 231-47.

On April 1, 2009, Plaintiff visited Dr. Seema Rathi at the request of the Social Security

Administration ("SSA").  R. 204–05.  Dr. Rathi noted the following:

> 45 year old male was examined on 4/01/09 for disability eye examination
> with complaints of loss of vision in the left eye after a stab injury from a glass in
> August, 2008 in the Dominican Republic from where he was operated and then
> flown to New York and had follow up surgery at the New York Eye and Ear
> Infirmary.  He is scheduled for further surgery.  His right eye is okay.  The family
> ocular history is noncontributory.  The patient is not allergic to medications.  His
> medical history is significant for asthma and is on treatment.  The patient is not
> working for two years at the gas station and was very upset about history of
> taking of his work and used the derogatory words and left the office very upset,
> talking rudely to the secretary on the way out.

R. 204–05.

On April 30, 2009, at the request of the Social Security Administration, Plaintiff was

examined by Dr. Gene Matusow, chief of the ophalmology section of St. Barnabas Hospital in

Armonk, New York.  R. 219.  Dr. Matusow stated that Plaintiff "complained of blurred vision."

R. 219.  Upon examination, Dr. Matusow noted that "[u]ncorrected visual acuity was 20/20 in

the right eye and no light perception in the left eye."  R. 219.  He opined that Plaintiff had "a

permanent partial visual disability as a result of blindness in his left eye secondary to trauma and

a ruptured globe."  R. 220.

On May 14, 2009, disability analyst D. Newsome attempted to determine Plaintiff's

residual functional capacity ("RFC") from evidence in the record.  R.  208–213.  He found that

Plaintiff suffered from no exertional limitations, stating that  "several attempts have been made

---

[9] "Oxycodone is used to relieve moderate to severe pain."  Oxycodone, Medline Plus
Drug Information, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682132.html, (last
visited Oct. 22, 2013).

4

to obtain [activities of daily living], however claimant has not responded." R. 209.  Newsome

also found no postural, manipulative, communicative or environmental limitations. R. 210–11.

With respect to visual limitations, Newsome stated that Plaintiff had unlimited near acuity, far

acuity, accommodation and color vision, but had limited depth perception and field of vision. R.

210.  In a section of the RFC form where he was asked to "[d]escribe how the faculties checked

'limited' are impaired" and to provide evidence in support of his conclusions, he wrote only the

following: "blindness in left eye." R. 210.   With respect to Plaintiff's symptoms, Newsome

stated that Plaintiff "is a 44 y/o with allegations of vision impairment in left eye. [Plaintiff] does

not discribe [sic] how these symptoms limit his functioning.  Therefore a credibility statement

can not be made." R. 211.

**C.**    **Plaintiff's Testimony at the Administrative Hearing**

After Plaintiff's application was initially denied on May 14, 2009, Plaintiff timely

requested a hearing before an administrative law judge ("ALJ"). R. 23–57, 61.  On August 19,

2010, a hearing was conducted by ALJ Dennis Katz, at which Plaintiff was represented by Joe

Drake Thomas, Esq.  R. 42–57.

Plaintiff first testified that he had not worked since August 12, 2008.  R. 44.  On that

date, according to Plaintiff, he was injured when he was "stabbed in the eye with a champagne

fluted glass" while vacationing in the Dominican Republic.  R. 44–45.   Plaintiff stated that he

had undergone two operations in the United States as a result of the injury, and that the injury

rendered him blind in his left eye.  R. 45.

Plaintiff testified that, prior to his injury, he was trying to operate his own wholesale

topsoil business.  R. 45.  Asked by the ALJ why his injury prevented him from continuing that

business, Plaintiff responded that his "abilities and [his] coordination on the road . . . aren't that

good." R. 46.  With respect to his driving abilities, Plaintiff further stated as follows:

> Driving wise, I have to take my time a little bit more than normal,
> occasionally I miss my turns because I don't see the left side, you know I have to
> move totally just about to a 360 position on my own when I am out driving which
> I used to be as a normal driver would be able to use their peripheral vision which
> I don't have.

R. 46–47.  When asked by the ALJ how his impairment would prevent him from doing "office

work or brokerage work or something like that that does not involve driving a vehicle," Plaintiff

replied that "[b]y even using the phone it takes me longer even dialing or reading certain things,

I am skipping words, I am losing lines where I am reading, I have to go back to re-see these

things and as I do that occasionally I get headaches as well with this." R. 48.  Plaintiff stated

that, for the previous two years, he had been living with his mother, who supported him.  R. 48.

Plaintiff testified that he had tried to find work after losing vision in his left eye, but that

he had not been successful.  R. 48.  He stated that he had a commercial driver's licence "but that

some of the people feel it is a risk because of the elevation and [his] sight." R. 48.  With respect

to obtaining work that did not require driving, Plaintiff stated that his lack of computer

proficiency would cause him difficulties.  R. 48–49.

Plaintiff was then questioned by his attorney, Mr. Thomas.  R. 49.  Mr. Thomas asked

Plaintiff to elaborate on the difficulties he experienced with his right eye, to which Plaintiff

responded that "[o]utside of headaches I get blurry vision, you know because it is a strain, it is

the only eye functioning." R. 49.  The blurriness, according to Plaintiff, would occur at random

several times daily.  R. 49.  Plaintiff also testified that he had problems with his balance, and that

when walking he would "teeter totter" and lose his balance, as well as bump into things.  R. 49.

With respect to medication, Plaintiff testified that he would take Percocet twice daily for his

headaches and that it would cause him blurriness in his right eye. R. 50. According to Plaintiff, the blurriness caused him dizziness and had worsened since 2008. R. 51.

The ALJ then asked Plaintiff further questions with the aim of resolving gaps in his work history in the years prior to his disability application. R. 52. Plaintiff stated that, prior to his topsoil venture, he had worked as a gas station manager. R. 52. He further stated that he had earned $6,200 in 2008, and that he did not file any tax returns. R. 55.

On December 2, 2010, ALJ Katz conducted a continuation hearing at which Plaintiff appeared, represented by Antonio Otero, Esq., along with Vocational Expert ("VE") Don Schader. R. 23–41. According to ALJ Katz, the purpose of the hearing was "to get testimony from vocational expert so [he] could better understand the vocational implications of [Plaintiff's] impairment." R. 25.

Plaintiff first testified that in 2001, he worked as a gas station manager, which entailed a "basic routine, and getting stuff off of the pumps, and the screens, and writing down some daily issues." R. 27–28. The VE then testified that such a job would be classified in the Dictionary of Occupational Titles as the manager of an automobile service station (DOT code 185.167-014), a job at a medium exertional level. R. 28–29. The VE stated that he was "not sure" whether a person with vision in only one eye could perform such a job. R. 29. The following colloquy then took place:

> [ALJ]: You're not sure. Well, does that job require a particular depth perception, or binocular vision, or can it be done with a person that does not have a depth perception, or peripheral vision on one side as would be typical of a person that doesn't have vision in one eye?
>
> [VE]: Yeah. I would think the manager could be done, Judge. The problem is, you know, I'm not sure what his – or how bad his

> depth perception is, or if it is even – I'm assuming the mechanic job would probably be a little bit harder for him.
>
> [ALJ]:   Right. But you're not sure if the job requires depth perception or not?
>
> [VE]:   I think that job could be done without a great deal of depth perception, Judge.

R. 29–30.   The ALJ then asked the VE whether there were "other jobs that coud be done in the national economy for a person that doesn't have vision in both eyes." R. 30. The VE stated that Plaintiff could perform the job of mail room clerk (DOT code 209.687-026), a job at the light exertional level that involves sorting and distributing mail. R. 30–31. Asked by the ALJ whether he thought he would be capable of performing such a job, Plaintiff stated "I've never really worked in those fields, Judge. I worked only in the construction field." R. 31.

Mr. Otero, Plaintiff's representative, then questioned the VE. R. 32. Mr. Otero asked the VE whether a job as a gas station manager would pose safety risks to Plaintiff, given that he would be surrounded by moving cars. R. 32. The VE stated that he did not think Plaintiff would be at risk because "[i]t's not, you know, you are not looking at what I would consider, you know, a busy street. It's a parking lot for a gas station." R. 33. The following colloquy then took place:

> [Otero]:   Now and, in addition, he is blind in one eye, and he has problems with vertigo and blurriness in the other eye, and strain on the one eye that he is left with the function, and having to read certain meter readings from these gas pumps. I don't know how familiar you are with them, and especially the settings that the state comes in to make sure that the amount that is being charged is for the exact amount being pumped. Wouldn't that place any particular strain on a person with just one eye, the right eye, with some limited vision?
>
> [VE]:   Okay. You are talking about one eye that –

[Otero]:        Yes.

[VE]:           – but basically with the other eye he had problems too now.

[ALJ]:          Well, the other – he is giving you a hypothetical where in the other
                eye he can see but he has vertigo and dizziness at times, and he is
                asking whether that would present a problem in reading meters
                and, again, crossing the places where cars come and go?

[VE]:           Yeah.  Well, probably with vertigo, and problems in the other eye I
                would probably not recommend that job for now.

R. 34.

With respect to the mailroom clerk job, the VE testified that it would involve the use of

computers.  R. 35.  Mr. Otero asked the VE whether jobs involving computer work would

"present a problem for someone with my client's vision problems."  R. 35.  The VE responded

that "I don't know if it would present a problem with somebody with vision in only one eye.

Now if the other eye is a problem it – yeah.  I don't have enough information to know whether

this would cause eyestrain for him or not or, you know, headaches."  R. 35.  Mr. Otero asked the

VE what level of hand and eye coordination the mailroom clerk job required, to which the VE

replied "some."  R. 36.  The VE was then asked whether the DOT description of the job, which

was last updated in 1987, accurately reflected the job as it was presently performed; the VE

responded that the job now entailed computer use, and that "I think it's something that can be

learned very quickly, and actually now I'm not sure about this particular person, but a lot of

people have that basic computer skill."  R. 37.  The VE suggested the use of a magnifying glass

as a means for Plaintiff to cope with potential eyestrain.  R. 37–38.

**D.**      **Denial of Plaintiff's Claim by ALJ and Appeals Council; Plaintiff's Initiation of Action Seeking Federal District Court Review**

In a decision dated January 11, 2011, ALJ Katz applied the five-step analysis set forth in 20 C.F.R. §§ 404.1520, 416.920 and determined that Plaintiff was not disabled within the meaning of the Social Security Act.  R. 12–19.  At step one, ALJ Katz found that Plaintiff had not engaged in substantial gainful activity since October 22, 2008, the date of his disability application.  R. 14. At steps two and three, ALJ Katz determined that Plaintiff had a severe left eye impairment, but that it did not meet or equal any of the listed impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1.  R. 14–15.  At step four, the ALJ found that Plaintiff had the residual functional capacity "to perform a full range of work at all exertional levels," but that he could not "perform jobs that require peripheral vision or depth perception."  R. 15–16. The ALJ then determined that, given his RFC, Plaintiff would be able to perform his past relevant work as the manager of a gas station.  R. 17.  Even though this determination was fatal to Plaintiff's claim, the ALJ proceeded in the alternative to step five and found that there were jobs that existed in the national economy that Plaintiff would be capable of performing; specifically, the ALJ identified the light exertional level job of a mailroom clerk. R. 17–18.

Plaintiff requested review of the ALJ's decision by the Appeals Council, but the Appeals Council denied his request on July 16, 2012.  R. 1–5.  The ALJ's January 11, 2011, decision thus became the final decision of the Commissioner and thereby is subject to review in this federal court action, which was commenced by Plaintiff on September 10, 2012.  Dkt. No. 2.

# III. <u>DISCUSSION</u>

**A.**    <u>**Legal Standards**</u>

    1.    *Standard of Federal District Court Review*

Section 405(g) of Title 42 of the United States Code entitles a Social Security claimant to seek judicial review of the Commissioner's final decision denying such a claimant's application for disability benefits. District courts are empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "It is not the function of a reviewing court to decide *de novo* whether a claimant was disabled." Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999). Rather, the court's review is limited to "'determin[ing] whether there is substantial evidence supporting the Commissioner's decision and whether the Commissioner applied the correct legal standard.'" Poupore v. Astrue, 566 F.3d 303, 305 (2d Cir. 2009) (quoting Machadio v. Apfel, 276 F.3d 103, 108 (2d Cir. 2002)).

    2.    *Determination of Statutory Disability*

To qualify for benefits under the Act, a claimant must demonstrate that he is disabled. The Act defines "disability" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). In addition, a claimant is eligible for disability benefits under the Act only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work

11

exists in the immediate area in which he lives, or whether a specific job vacancy
exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The SSA uses the following five-step analysis to evaluate disability claims:

1.  The Commissioner considers whether the claimant is currently engaged in
    substantial gainful activity.

2.  If not, the Commissioner considers whether the claimant has a "severe
    impairment" which limits his or her mental or physical ability to do basic
    work activities.

3.  If the claimant has a "severe impairment," the Commissioner must ask
    whether, based solely on medical evidence, claimant has an impairment
    listed in Appendix 1 of the regulations.  If the claimant has one of these
    enumerated impairments, the Commissioner will automatically consider
    him disabled, without considering vocational factors such as age,
    education, and work experience.

4.  If the impairment is not "listed" in the regulations, the Commissioner then
    asks whether, despite the claimant's severe impairment, he or she has
    residual functional capacity to perform his or her past work.

5.  If the claimant is unable to perform his or her past work, the
    Commissioner then determines whether there is other work which the
    claimant could perform.  The Commissioner bears the burden of proof on
    this last step, while the claimant has the burden on the first four steps.

Shaw v. Chater, 221 F.3d 126, 132 (2d Cir. 2000).  In determining whether a claimant is

disabled, the Commissioner must consider "(1) the objective medical facts; (2) diagnoses or

medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by

the claimant or others; and (4) the claimant's educational background, age, and work

experience." Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983); see also 20 C.F.R. §

404.1529.  "'[S]tatements about [a claimant's] pain or other symptoms will not alone establish

that [the claimant is] disabled.'"  Cruz v. Astrue, No. 06 Civ. 3670 (LTS)(DCF), 2009 WL

1024242, at *13 (S.D.N.Y. Apr. 9, 2009) (quoting 20 C.F.R. §§ 404.1529(a), 416.929(a)).

12

"Where an ALJ makes a credibility assessment and decides to discount a claimant's subjective complaints of pain, the reviewing court must defer to that credibility assessment, as long as the ALJ's findings are supported by substantial evidence." Id.

    3.    *Substantial Evidence*

"In determining whether the agency's findings are supported by substantial evidence, 'the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.'" Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012) (quoting Mongeur, 722 F.2d at 1038). Substantial evidence is "'more than a mere scintilla'" and "'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Lamay v. Comm'r of Soc. Sec., 562 F.3d 503, 507 (2d Cir. 2009) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). The substantial evidence standard is "even more" deferential than the "'clearly erroneous' standard." Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012). The reviewing court must defer to the Commissioner's factual findings and the inferences drawn from those facts, and the Commissioner's findings of fact are considered conclusive if they are supported by substantial evidence. See 42 U.S.C. § 405(g); Shaw, 221 F.3d at 131. Accordingly, "once an ALJ finds facts," the reviewing court "can reject those facts 'only if a reasonable factfinder would *have to conclude otherwise*.'" Brault, 683 F.3d at 47 (quoting Warren v. Shalala, 29 F.3d 1287, 1290 (8th Cir. 1994)).

    4.    *Treating Physician Rule*

In considering any medical opinions set forth in the administrative record, the ALJ should give the opinion of a claimant's treating physician "'controlling weight'" if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not

13

inconsistent with the other substantial evidence in [the] case record.'" <u>Ocasio v. Colvin</u>, No. 12-CV-6002 (JG), 2013 WL 1395846, at *9 (E.D.N.Y. Apr. 5, 2013) (quoting 20 C.F.R. § 404.1527(d)(2)).  A "'treating source'" is a claimant's "'own physician, psychologist, or other acceptable medical source who provides [a claimant], or has provided [a claimant] with medical treatment or evaluations and who has, or has had, an ongoing treatment relationship with [a claimant].'"[10] <u>Id.</u> at *9 n.26 (quoting 20 C.F.R. § 404.1502).

     5.   <u>*Duty to Develop Record*</u>

Given the "non-adversarial nature" of the administrative proceedings, the ALJ "has an obligation to develop the record . . . regardless of whether the claimant is represented by counsel." <u>Shaw</u>, 221 F.3d at 131.  Because the "treating physician rule dovetails with the ALJ's affirmative duty to develop the administrative record," the "duty of the ALJ is 'particularly important when it comes to obtaining information from a claimant's treating physician.'" <u>Ocasio</u>, 2013 WL 1395846, at *9 (quoting <u>Devora v. Barnhart</u>, 205 F. Supp. 2d 164, 172 (S.D.N.Y. 2002)).  Accordingly, the ALJ's obligation to develop the record "includes obtaining the treating physicians' assessments of the claimant's RFC." <u>Id.</u>  It is appropriate to "remand[] to the Commissioner with directions to develop the administrative record further and to reconsider" where necessary to ensure an accurate assessment of a claimant's entitlement to benefits based on a fully developed record.  <u>Burger v. Astrue</u>, 282 F. App'x 883, 885 (2d Cir. 2008).

---

    [10] An "ongoing treatment relationship" exists where the claimant "see[s], or ha[s] seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the claimant's] medical condition(s)." 20 C.F.R. § 404.1502. The SSA "may consider an acceptable medical source who has treated or evaluated [the claimant] only a few times . . . to be [the claimant's] treating source if the nature and frequency of the treatment or evaluation is typical for [the claimant's] condition(s)." <u>Id.</u>

14

**B.**     <u>Analysis</u>

Plaintiff does not appear to contest the Commissioner's findings with respect to the first three steps of the five-step inquiry.  Rather, Plaintiff argues that the ALJ did not properly assess his subjective complaints of pain, including the potential side effects of his medication.  Pl.'s Mem. at 2–3.  Plaintiff also appears to argue that the ALJ's RFC determination was not supported by substantial evidence in a more general sense.  <u>Id</u>. at 2.  To this end, Plaintiff suggests that the ALJ did not account for the fact that his impaired vision would subject him to "losing his life in the course of [a] violent situation" at work, during which he would be unable to see a potential attacker.  Pl.'s Mem. at 3.  According to Plaintiff, the ALJ's decision "was not based on reason, evidence or knowledge," and was "an unintelligent decision, which in essence lack[ed] any safety net for Plaintiff."  Pl.'s Mem. at 3.  Plaintiff adds that "there was no evidence submitted to refute [his] testimony or the evidence of any of the Doctors."  Pl.'s Mem. at 6.  The Commissioner, in contrast, argues the decision of the ALJ was supported by substantial evidence in all respects and should be affirmed.  <u>See</u> Def.'s Mem. at 2.

1.     *Plaintiff's Credibility*

"Where a claimant complains that he or she is limited by pain, the ALJ is required, first, to determine whether the claimant suffers from a 'medically determinable impairment[] that could reasonably be expected to produce' the pain alleged."  <u>Barone v. Astrue</u>, No. 09 Civ. 7397 (KBF)(DF), 2011 WL 7164421, at *13 (S.D.N.Y. Dec. 27, 2011) (quoting 20 C.F.R. § 404.1529(c)(1)) (Report & Recommendation), <u>adopted by</u> 2012 WL 382925 (S.D.N.Y. Feb. 6, 2012).  If the ALJ concludes that the claimant has such an impairment, "then the ALJ must take the second step of evaluating the intensity and persistence of the claimant's symptoms" by "considering all of the available evidence."  <u>Id.</u>  "[W]here the ALJ finds that the medical

15

evidence does not substantiate the claimant's" subjective allegations regarding pain and other limitations, "the ALJ must assess the claimant's credibility by considering seven factors enumerated in the Social Security regulations." Rivera v. Astrue, No. 10 CV 4324 (RJD), 2012 WL 3614323, at *14 (E.D.N.Y. Aug. 21, 2012). These factors are: (1) the claimant's "daily activities;" (2) the "location, duration, frequency, and intensity" of the claimant's "pain or other symptoms; (3) "[p]recipitating and aggravating factors;" (4) the "type, dosage, effectiveness, and side effects of any medication" the claimant "take[s] or ha[s] taken to alleviate [his] pain or other symptoms;" (5) "[t]reatment, other than medication," the claimant "receive[s] or ha[s] received for relief of [his] pain or other symptoms;" (6) "[a]ny measures" the claimant "use[s] or ha[s] used to relieve [his] pain or other symptoms;" and (7) "[o]ther factors concerning [his] functional limitations and restrictions due to pain or other symptoms." 20 C.F.R. § 404.1529(c)(3)(i)–(vii); see also Baron v. Astrue, No.11 Civ. 4262 (JGK)(MHD), 2013 WL 1245455, at *28 (S.D.N.Y. Mar. 4, 2013) (Report & Recommendation), adopted by 2013 WL 1364138 (S.D.N.Y. Mar. 26, 2013).

"The ALJ ultimately exercises broad discretion to 'arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant.'" Castellano v. Astrue, No. 07 Civ. 4608 (NRB), 2008 WL 2951925, at *7 (S.D.N.Y. July 30, 2008) (quoting Perez v. Barnhart, 234 F. Supp. 2d 336, 340–41 (S.D.N.Y. 2002)). Additionally, "[u]nder the substantial evidence standard, a credibility finding made by an ALJ is entitled to deference by a reviewing court." Acevedo v. Astrue, No. 11 Civ. 8853 (JMF)(JLC), 2012 WL 4377323, at *11 (S.D.N.Y. Sept. 4, 2012) (Report & Recommendation), adopted by 2012 WL 4376296 (S.D.N.Y. Sept. 24, 2012). Nevertheless, "[a]n ALJ who finds that a claimant is not credible must do so 'explicitly and with sufficient specificity to enable the Court

16

to decide whether there are legitimate reasons for the ALJ's disbelief and whether his determination is supported by substantial evidence.'" Rivera, 2012 WL 3614323, at *14 (quoting Taub v. Astrue, No. 10-CV-2526 (ARR), 2011 WL 6951228, at *8 (E.D.N.Y. Dec. 30, 2011)).

Here, applying the two-step analysis detailed above, the ALJ found that Plaintiff's "medically determinable impairment could reasonably be expected to cause some of the alleged symptoms," but that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not credible to the extent they [were] inconsistent with" his RFC assessment. R. 16. For the reasons stated below, remand is appropriate because the ALJ failed to properly consider all of the factors set forth in 20 C.F.R. § 404.1529(c)(3), and thus performed an incomplete analysis of Plaintiff's credibility.

The ALJ began his credibility analysis by correctly noting that there was no evidence that Plaintiff ever complained to any doctor at New York Eye and Ear Infirmary of headaches, pain, dizziness or vertigo, nor did Plaintiff mention such symptoms in his disability application. See R. 16, 141–148, 219. Further evidence properly cited by the ALJ to discount Plaintiff's credibility included his continued driving, his refusal to provide the SSA with information about his activities of daily living despite repeated requests, his spotty work history in the years prior to his application, his failure to file tax returns, and his inappropriate conduct during his appointment with Dr. Rathi. R. 46–47, 55, 204–05. Nevertheless, the ALJ erred when he provided no analysis of the "type, dosage, effectiveness, and side effects of any medication" Plaintiff "take[s] or ha[s] taken to alleviate [his] pain or other symptoms," as he was required to do. 20 C.F.R. § 404.1529(c)(3)(iv). Because Plaintiff's medications included Percocet, a

painkiller used to treat "moderate to severe pain,"[11] such an omission cannot be deemed immaterial. The negative consequences of the ALJ's failure to address Plaintiff's medications are further magnified because of Plaintiff's claim that Percocet was a "[p]recipitating and aggravating factor[]" for his blurry vision. 20 C.F.R. § 404.1529(c)(3)(iii); see R. 50–52. Without a discussion of Plaintiff's medications, I cannot conclude that the ALJ's credibility determination was supported by substantial evidence.

Accordingly, because the ALJ failed to discuss at least two of the factors set forth in 20 C.F.R. § 404.1529(c)(3), I respectfully recommend that the case be remanded on this basis. On remand, the ALJ should re-assess Plaintiff's credibility in light of all the factors set forth in 20 C.F.R. § 404.1529(c)(3).

2.    *RFC Determination*

With respect to the ALJ's RFC determination, Plaintiff argues that his "injuries are not going to allow him to perform any[] heavy or light duty work" and that he "cannot maintain any gainful employment." Pl.'s Mem. at 5–6. The Commissioner argues that "[n]o medical evidence was adduced indicating that plaintiff had any impairment other than his left eye impairment, which severely reduced his vision in his left eye," and that the ALJ's RFC determination was supported by Dr. Matusow's report. Def.'s Mem. at 11.

In his decision, the ALJ determined that Plaintiff had the RFC to perform "a full range of work at all exertional levels," except for "jobs that require peripheral vision or depth perception." R. 15. However, this determination is problematic in several crucial respects. First, as acknowledged by the ALJ, the record contains only one "opinion" regarding Plaintiff's RFC, the assessment prepared by disability analyst D. Newsome. See R. 17 ("There is no opinion

---

[11] See, supra, note 9.

18

evidence in the record, other than the residual functional capacity assessment prepared by the State agency, single decision maker as part of the State's adjudication."). However, D. Newsome's assessment provides minimal support for the ALJ's determination; it discusses neither the evidence that supports its conclusions nor the specific facts upon which its conclusions are based, even though the Physical Residual Functional Capacity Assessment form issued by SSA required the inclusion of such information. See R. 208–10. As noted above, D. Newsome's "explanation" of his determination as to Plaintiff's visual functioning simply restates Plaintiff's impairment in its most general terms, *i.e.*, "blindness in the left eye," and provides no further explication. R. 210. The Commissioner's suggestion that the Dr. Matusow's report constitutes substantial evidence for the ALJ's RFC determination is similarly unconvincing, because Dr. Matusow's assessment that Plaintiff suffered from "a permanent partial visual disability as a result of blindness in his left eye," is equivocal, at best, and does not even mention the extent to which Plaintiff's left eye impairment affected his depth perception or peripheral vision.[12] The remainder of the record consists entirely of raw treatment records from New York Ear and Eye Infirmary and contains no information about the extent to which Plaintiff's left eye blindness affects his overall peripheral vision and depth perception. Unsurprisingly, the New York Ear and Eye Infirmary records also contain no information regarding Plaintiff's physical capabilities, and thus no medical evidence upon which either D. Newsome or the ALJ could have based their respective determinations that Plaintiff could perform work at all exertional

---

[12] The failure to obtain medical evidence on the true extent of Plaintiff's loss of depth perception and peripheral vision ultimately frustrated meaningful analysis of the types of work that Plaintiff could perform at steps four and five. For example, the ALJ relied on the vocational expert's testimony that the job of gas station manager could be done without a "great deal" of depth perception in finding that Plaintiff had the RFC to perform the job. See R. 17, 30. However, there is no medical evidence in the record discussing the extent of Plaintiff's loss of depth perception.

levels.[13]  Finally, none of the doctors at New York Ear and Eye Infirmary were asked to provide

any assessment of Plaintiff's functional limitations.  See Castellano v. Astrue, No. 07 Civ. 4608

(NRB), at *19, 2008 WL 2951925, at *6 (S.D.N.Y.2008) (noting that "record is lacking the

customary residual functional capacity assessment" from claimant's physicians).  In sum, the

record is inadequate, despite the fact that in the non-adversarial context of a disability benefits

hearing it remains the responsibility of the ALJ to fully develop the medical record so as to

insure an accurate assessment of a claimant's RFC.  See Perez v. Chater, 77 F.3d 41, 47 (2d.

Cir.1996); accord Burger v. Astrue, 282 Fed. Appx. 883, 884–85 (2d Cir. 2008).   Under these

circumstances, the matter should be remanded for the purpose of developing the record.  See

Pettey v. Astrue, 582 F.Supp.2d 434, 436–37 (W.D.N.Y.2008) (remanding "for the purpose of

gathering additional medical records and reports").

        I therefore recommend remanding the matter, pursuant to 42 U.S.C. § 405(g), sentence

four, for further administrative proceedings in which a complete record should be developed.

Additionally, because the treating physician rule "dovetails" with the ALJ's duty to develop the

record, on remand, the ALJ should request an RFC assessment from at least from Dr. Ponce,

who appears to have  treated Plaintiff on an ongoing basis at New York Eye and Ear Infirmary.

Ocasio, 2013 WL 1395846, at *9 (quoting Devora v. Barnhart, 205 F. Supp. 2d 164, 172

(S.D.N.Y. 2002)).

_____

        [13] While the ALJ cannot be faulted for Plaintiff's failure to cooperate with respect to
providing information about his activities of daily living, the fact remains that there are no
medical findings in the record, consultative or otherwise, to support the ALJ's conclusion that
Plaintiff was physically capable of work at all exertional levels.  SSA regulations specifically
authorize the ALJ to pay for a consultative examination where necessary to ensure a developed
record. Burger v. Astrue, 282 Fed. Appx. at 885; see also 20 C.F.R. § 404.1512(f).

## IV.  <u>CONCLUSION</u>

For the reasons set forth above, I respectfully recommend that Defendant's motion for judgment on the pleadings be **DENIED** and that Plaintiff's motion for judgment on the pleadings be **GRANTED** to the extent that the case be **REMANDED** for further administrative proceedings consistent with this Report & Recommendation pursuant to 42 U.S.C. § 405(g), sentence four.

Dated: October 23, 2013
     White Plains, New York

Respectfully submitted,

Paul E. Davison
United States Magistrate Judge

### <u>NOTICE</u>

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days, plus an additional three (3) days, or a total of seventeen (17) days, from service of this Report and Recommendation to serve and file written objections.  See also Fed. R. Civ. P. 6(a), (b), (d).   Such objections, if any, along with any responses to the objections, shall be filed with the Clerk of the Court with extra copies delivered to the chambers of the Honorable Vincent L. Briccetti, at the Honorable Charles L. Brieant, Jr. Federal Building and United States Courthouse, 300 Quarropas Street, White Plains, New York 10601, and to the chambers of the undersigned at the same address.

Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be entered.

Requests for extensions of time to file objections must be made to Judge Briccetti.